**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____
                                                        )
FAMILY TRUST OF MASSACHUSETTS, INC.  )
                                                        )
                 Plaintiff,                             )
                                                        )
         v.                                             )
                                                        )        Civil Action No. 11-00680 (RBW)
                                                        )
UNITED STATES OF AMERICA                  )
                                                        )
                 Defendant.                             )
_____ )

**MEMORANDUM OPINION**

This case arises from a claim brought under a section of the Internal Revenue Code,

specifically, 26 U.S.C. § 7428(a)(2) (2006), which allows a party to request declaratory relief

from a United States District Court if the Internal Revenue Service ("IRS") fails to make a

determination on its request for tax-exempt status within 270 days, Complaint ("Compl.") at 1,

and the case is currently before the Court on the parties' cross-motions for summary judgment.

United States' Motion for Summary Judgment ("Gov't's Mot.") at 1; Plaintiff's Cross-Motion

for Summary Judgment and Memorandum in Opposition to Defendant's Motion for Summary

Judgment ("Pl.'s Mem.") at 1.  The plaintiff, the Family Trust of Massachusetts, Inc. ("FTM"),

filed an application with the IRS for tax-exempt status on November 17, 2005, Administrative

Record ("AR") at 00001, and the IRS has yet to make a determination.  For the reasons set forth

below, the Court will grant the IRS's motion for summary judgment, and deny the FTM's cross-

motion for summary judgment.[1]

---

[1]      In addition to the previously cited materials, in rendering its decision on the cross-motions, the Court
considered the United States' Memorandum in Support of Motion for Summary Judgment ("Gov't's Mem."), The
                                                                                        (Continued . . . )

## I.  FACTUAL BACKGROUND

The FTM is a trustee for over 300 disabled and elderly individuals who participate in a

pooled-asset special needs trust program.[2]  AR at 00015-16; AR at 00055-56; AR at 00334-335.

A pooled-asset special needs trust that meets the requirements of the Medicaid Statute allows a

disabled beneficiary or his or her family to establish a trust account that will supplement, but not

replace, the benefits the beneficiary receives from Supplemental Security Income ("SSI"),

Medicaid, and other governmental benefits programs.  AR at 00420.  It essentially allows

disabled beneficiaries to "maintain their federal Medicaid and/or [SSI] eligibility, despite having

assets in excess of federally allowed limits."  Gov't's Mem. at 1.

The FTM was founded by Peter Macy ("Mr. Macy"), a private Massachusetts attorney

who specializes in elder law.  AR at 00016.  Mr. Macy incorporated the FTM as a special needs

trust in 2003.  AR at 00011; AR at 00021.  He serves as President, Treasurer, and sole Executive

Director, and his law office is listed as the FTM's principal place of business.  AR at 00016; AR

at 00025.  His "duties as Executive Director and Treasurer include presiding over meetings of the

board of directors and supervising the day-to-day business matters of the [FTM], including

financial matters, bookkeeping, and corresponding directly with outside parties."  AR at 00016.

He "works with the [FTM] daily, averaging two hundred and sixty hours per year."  Id.

Mr. Macy refers his own disabled clients to the FTM "if they meet the criteria of [the]

FTM's charitable class."  AR at 00222.  Additional clients have been obtained via legal or health

care referrals to Macy, i.e., through "word-of-mouth in the Elder Law legal community."  AR at

---

( . . . continued)
United States' Memorandum in Reply in Support of its Motion for Summary Judgment and in Opposition to
Plaintiff's Motion for Summary Judgment ("Gov't's Reply"), Plaintiff's Reply Memorandum in Support of its
Cross-Motion for Summary Judgment ("Pl.'s Reply"), along with the parties' supporting statements of facts.

[2]      The Omnibus Budget Reconciliation Act of 1993, Pub. L. 106-66, 107 Stat. 622-24, which amended 42
U.S.C. § 1396p (2006) ("Medicaid Statute"), created this category of "special needs trust."

00018; AR at 00079.  Since 2005, the FTM's clientele has increased from 20 beneficiaries to

over 300, AR at 00068; AR at 00328; AR at 00314, and the trust "hopes to expand the number of

participants," AR at 00016.  Consequently, annual revenues also rose from \$5,825 in 2004, AR

at 00102, Lines 12 & 18, to \$667,679 in 2009, AR at 00551, Lines 12 & 19.

On November 21, 2005, the FTM applied for a determination from the IRS that it is an

organization encompassed by § 501(c)(3) and therefore tax-exempt under § 501(a) of the Internal

Revenue Code.  See 26 U.S.C. §§ 501(a) & 501(c)(3) (2006); AR at 00001.  The IRS

acknowledged receipt of the application on November 28, 2005, and until at least August of

2007, the FTM continued to respond to numerous requests for further information and

explanations.  AR at 00047; AR at 00054; AR at 00077; AR at 00097A; AR at 00098-99; AR at

00152-155.  On February 12, 2008, the IRS issued a proposed adverse determination letter to the

FTM.  AR at 00161-169.  Despite the FTM's response to the IRS's proposed adverse

determination, AR at 00186A, and the FTM's continued cooperation with subsequent requests

from the IRS for information, e.g., AR at 00187; AR at 00217D; AR at 00242, the IRS has yet to

issue to the plaintiff "a notice of determination," Compl. ¶ 6.  As a result, the FTM initiated this

action under 26 U.S.C. § 7428(a)(2), seeking a declaration by this Court that it "is exempt from

federal income taxation."  Id. at 1.

## II.  STANDARD OF REVIEW

This Court has "original jurisdiction of any civil action against the United States provided

in . . . [§] 7428 . . . of the Internal Revenue Code of 1986."  28 U.S.C. § 1346(e) (2006)

(amended 2011).  And, § 7428 "permits [the Court of Federal Claims], the United States Tax

Court and the United States District Court for the District of Columbia to issue declaratory

judgments on the initial qualification of an organization for tax exempt status under

Revenue Code] § 501(c)(3) if a plaintiff has exhausted its administrative remedies." Church of

the Visible Intelligence that Governs the Universe v. United States, 4 Cl. Ct. 55, 60 (1983). "An

organization requesting the determination . . . shall be deemed to have exhausted its

administrative remedies with respect to a failure by the Secretary [of the Department of the

Treasury] to make a determination with respect to such issue at the expiration of 270 days after

the date on which the request for such determination was made if the organization has taken, in a

timely manner, all reasonable steps to secure such determination." 26 U.S.C. § 7428(b)(2).

Because the FTM took all reasonable steps to secure a determination in a timely manner, and not

having received a determination before 270 days had elapsed after its request was submitted, the

Court agrees, as the defendant concedes, that the FTM has satisfied the jurisdictional

requirements of § 7428(b)(2). See Gov't's Mem. at 13.

"The standard of review in [this case] is de novo and the scope of review is limited to the

administrative record." Arlie Found. v. I.R.S., 283 F. Supp. 2d 58, 61 (D.D.C. 2003). "The

legislative history of § 7428 makes it clear that Congress intended that this [C]ourt follow the

practices of the Tax Court in § 7428 declaratory judgment actions." Easter House v. United

States, 12 Cl. Ct. 476, 482-483 (1987) (citing Visible Intelligence, 4 Cl. Ct. at 60); see B.S.W.

Group, Inc. v. Comm'r, 70 T.C. 352, 353 (1978). Thus, "the Court's decision will be based upon

the assumption that the facts as represented in the administrative record . . . are true." Tax Court

Rule 217(b).

Upon consideration of the parties' cross-motions for summary judgment, "the [C]ourt

shall grant summary judgment only if one of the moving parties," Arlie, 283 F. Supp. 2d at 61,

shows that "there is no genuine issue as to any material fact and that the moving party is entitled

to a judgment as a matter of law," Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). "When

faced with cross-motions for summary judgment, th[is C]ourt must review each motion

separately on its own merits 'to determine whether either of the parties deserves judgment as a

matter of law.'" Rossignol v. Voorhaar, 316 F.3d 516, 523 (4th Cir. 2003); see also Fair

Housing Council of Riverside County, Inc. v. Riverside Two, 249 F.3d 1132, 1136 (9th Cir.

2001) ("It is well-settled in this circuit and others that the filing of cross-motions for summary

judgment . . . does not vitiate the court's responsibility to determine whether disputed issues of

material fact are present.") (internal quotations omitted).  "The evidence of the non-movant is to

be believed, and all justifiable inferences are to be drawn in [its] favor." Estate of Parsons v.

Palestinian Auth., 651 F.3d 118, 123 (D.C. Cir. 2011) (citing Andersen v. Liberty Lobby, 477

U.S. 242, 255 (1986)).  Additionally, "a moving party is 'entitled to a judgment as a matter of

law' [when] the nonmoving party has failed to make a sufficient showing on an essential element

of [its] case with respect to which [it] has the burden of proof." Maydak v. United States, 630

F.2d 166, 181 (D.C. Cir. 2010) (citing Celotex, 477 U.S. at 322-323).  And here, despite the

plaintiff's assertions to the contrary, Compl. at 1, "[t]he burden is on [the FTM] to establish that

it meets [the] statutory requirements" of § 501(c)(3), New Dynamics Found. v. United States, 70

Fed. Cl. 782, 799 (2006) (citing, inter alia, IHC Health Plans, Inc. v. Comm'r, 325 F.3d 1188,

1193 (10th Cir. 2003)); see also Found. of Human Understanding v. United States, 88 Fed. Cl.

203, 212 (2009) ("Courts have recognized that exemptions from tax are matters of 'legislative

grace,' and, accordingly, the burden of establishing entitlement to an exemption is on the

taxpayer.").[3]

---

[3]     The plaintiff claims that neither this Court, nor any other "court has decided the issue" of whether § 7491 is
applicable to declaratory judgment actions.  Pl.'s Reply at 5.  However, contrary to the plaintiff's understanding of
Polm Family Found., Inc. v. United States, 655 F. Supp. 2d 125 (D.D.C. 2009), see Pl.'s Reply at 5 ("Polm . . . did
not consider [§] 7491"), this Judge did consider the issue.  In Polm, the issue of whether § 7491 is applicable in such
cases was raised in the parties' pleadings, and footnote 4 of the Court's opinion clearly demonstrates, by
implication, that this Court considered the issue.  By relying on Tax Court Rule 142(a)(1) in placing the burden on
(Continued . . . )

### III.  LEGAL ANALYSIS

For the Court to declare the FTM exempt from federal income taxation, the

Administrative Record must demonstrate that it meets three requirements under §§ 501(a) and

(c)(3): "(1) it is organized and operated exclusively for an exempt purpose; (2) its net earnings do

not inure to the benefit of any private shareholder or individual; and (3) its activities do not . . .

attempt[] to influence legislation."  Visible Intelligence, 4 Cl. Ct. at 61.  The IRS does not

contend that the FTM is an organization that seeks to influence legislation.  Gov't's Mem. at 1

("[P]laintiff operates its Medicaid-qualified trust in a commercial manner that reflects private

business purposes."); see Gov't's Response to Pl.'s Stmt. of Facts at 19 ("Plaintiff has a

commercial purpose.").  That leaves only the first two requirements for analysis, and because the

organization purpose prong is the more difficult to assess, the Court will first address the issue of

private inurement.  See Presbyterian and Reformed Pub. Co. v. Comm'r, 743 F.2d 148, 153 (3d

Cir. 1984) (employing similar approach).

    A.  Do the FTM's net earnings inure to the benefit of any individual?

This assessment requires the Court to determine whether "the earnings of [the FTM]

inure[] to the private benefit of" an individual.  Presbyterian and Reformed Pub. Co., 743 F.2d at

153.  "The term 'net earnings' in the inurement-of-benefit clause . . . has been construed to

permit an organization to incur ordinary and necessary expenditures in the course of its

operations without losing its tax-exempt status."  Founding Church of Scientology v. United

---

( . . . continued)
the taxpayer to demonstrate exempt status in a declaratory judgment action, and necessarily rejecting the provision
in Rule 142(a)(2), which directs the Court to shift the burden under the circumstances required by § 7491, the Court
implicitly found that § 7491 was not controlling in declaratory judgment actions.  Polm, 655 F. Supp. 2d at 128 n.4.

States, 412 F.2d 1197, 1200 (Ct. Cl.), cert. denied, 397 U.S. 1009 (1970).  However, "an

examination [of the Internal Revenue Code] reveals unmistakable evidence that, underlying all

relevant parts of the Code, is the intent that entitlement to tax exemption depends on meeting

certain common law standards of charity—namely, that an institution seeking tax-exempt status

must serve a public purpose."  Bob Jones Univ. v. United States, 461 U.S. 574, 586 (1983).  "An

organization is not . . . operated exclusively for one or more of the [statutorily exempt] purposes .

. . unless it serves a public rather than a private interest."  26 C.F.R. § 1.501(c)(3)-1(d)(1)(ii).  To

meet this requirement, the FTM must establish that it is not "operated for the benefit of private

interests such as designated individuals, the creator or his family, shareholders of the

organization, or persons controlled, directly or indirectly, by such private interests."  26 C.F.R. §

1.501(c)(3)-1(d)(1)(ii).

"The public-benefit requirement highlights the quid pro quo nature of tax exemptions: the

public is willing to relieve an organization from the burden of taxation in exchange for the public

benefit it provides," IHC Health Plans, 325 F.3d at 1195 (citing Geisinger Health Plan v.

Comm'r, 985 F.2d 1210, 1215 (3d Cir. 1993)), because "[f]or every dollar that a man contributes

to these public charities, educational, scientific, or otherwise, the public gets 100 percent," Bob

Jones, 461 U.S. at 590 (citation omitted).  "The exemption from taxation of money and property

devoted to charitable and other purposes is based on the theory that the Government is

compensated for the loss of revenue by its relief from financial burdens which would otherwise

have to be met by appropriations from other public funds, and by the benefits resulting from the

promotion of the general welfare."  Bob Jones, 461 U.S. at 590 (citations and quotations

omitted).  In essence, anything less than "100 percent" would deny the public of at least some tax

revenue to which it is entitled, and, therefore, "no part of the net earnings . . . which inures to the

benefit of any private shareholder or individual" is permitted.  26 U.S.C. § 501(c)(3); see Orange

County Agr. Soc., Inc. v. Comm'r, 893 F.2d 529, 534 (2d Cir. 1990) ("An organization will not

qualify for tax-exempt status if even a small part of its income inures to a private individual.").

The term "individual" in the inurement clause of § 501(c)(3) "has been interpreted to

mean an insider of the charity."  United Cancer Council, Inc. v. Comm'r, 165 F.3d 1173, 1176

(7th Cir. 1999) (citing Orange County, 893 F.2d at 534).  "A substantial body of caselaw has

explored the concept of private benefit within the framework of the relationship between an

organization claiming tax-exempt status and its founder (or small group of related insiders)."

Rameses School of San Antonio, Texas v. Comm'r, 93 T.C.M. (CCH) 1092 (2007) (citing

cases).  Of the factors emerging repeatedly, "payment of salary . . . to the founder without any

accompanying evidence or analysis of the reasonableness of the amounts" is "indicative of

prohibited inurement and private benefit."  Id.  "A charity is not to siphon its earnings to its

founder, or the members of its board, or their families, or any[] . . . insider."  United Cancer

Council, 165 F.3d at 1176.  Ultimately, "[t]he test is functional" and "looks to the reality of

control rather than to the insider's place in a formal table of organization."  Id.

The IRS alleges, Gov't's Reply at 21, and the Administrative Record demonstrates that

Macy has complete and effective control over the FTM, AR at 00001; AR at 00016; AR at

00025.  He admittedly established the trust and has nurtured it since its inception, and has

afforded himself a position of considerable influence in the organization.  The Court finds that

"[a]n organizational structure like [the FTM]'s[,] entailing domination by the founder[,] raises

concern about the potential for abuse unless allayed by other information in the record."  Visible

Intelligence, 4 Cl. Ct. at 62 (citing Founding Church of Scientology, 188 Ct. Cl. at 498).  And

although "domination does not necessarily disqualify [the FTM] from exemption," id. (citing

Bubbling Well Church of Universal Love, Inc. v. Comm'r, 74 T.C. 531, 535 (1980)), such

circumstances do require "open and candid disclosure of all [relevant] facts . . . so that the Court

. . . can be assured that it is not sanctioning an abuse of the revenue laws," Bubbling Well, 74

T.C. at 535.  "If such disclosure is not made, the logical inference is that the facts, if disclosed,

would show that [the FTM] fails to meet the requirements of section 501(c)(3)."  Id.

The Court must, therefore, consider whether the FTM's disclosure was "open and

candid" in a manner sufficient for the Court to determine whether Mr. Macy's compensation was

reasonable.  While "payment of a reasonable salary to an employee of the organization does not

automatically result in inurement, . . . an excessive salary will."  Easter House v. United States,

12 Cl. Ct. 476, 487 (1987) (internal citation omitted).  "Whether a salary is reasonable or

excessive is a question of fact," id.; see also Church of Scientology of California v. Comm'r, 823

F.2d 1310, 1317 (9th Cir. 1987), and "[t]he value of [reasonable] services is the amount that

would ordinarily be paid for like services by like enterprises . . . under like circumstances (i.e.,

reasonable compensation)," 26 C.F.R. § 53.4958-4(b)(1)(ii)(A).  While the FTM claims that it

sets Mr. Macy's salary in accordance with the Internal Revenue Code, it does not actually offer

authoritative comparability data for the Court to determine whether the salary is, in fact,

reasonable, but relies instead on the strength of the Administrative Record.  Pl.'s Mem. at 13-14.

The Administrative Record, however, contains only the FTM's internal justifications for Mr.

Macy's salary.  AR at 00179-180; AR at 00082-83 ¶ 16.  The FTM finds no support in the

Administrative Record for its position beyond the assertions it has previously made to the IRS

regarding what comparable services would cost if performed by a similarly qualified individual.

AR at 00217H.  For the Court to determine whether Mr. Macy's salary is reasonable, it is not

enough for the FTM to simply say that "disinterested Directors determined that the compensation

was reasonable given the scope of Mr. Macy's duties, the number of beneficiaries served by [the] FTM and looking at comparable positions." Id.

The Court is unfortunately left only with the knowledge that Mr. Macy's salary has steadily increased in conjunction with the expansion of the services provided by the FTM and the infusion of funds into the trust, facts that weigh heavily against the FTM, as evidenced by its adamant, albeit futile, objection to the inclusion of its 2009 Tax Return as part of the Administrative Record. Order, Family Trust of Massachusetts v. United States of America, 11-cv-680 (RBW) (D.D.C. June 7, 2012); AR at 00557. The evidence makes clear that Mr. Macy's salary has been elevated commensurate with the FTM's increasing profitability, as it shows that between 2004 and 2009, the FTM's annual excess revenues increased from $5,197, AR at 00102, Line 21, to $362,524, AR at 00551, Line 19, while Mr. Macy's compensation followed suit, growing from $9,000 per year to $70,000 per year. See AR at 00102-148; AR at 00340-365; AR at 00557; AR at 00572.

Seeking to avoid the pitfall that potentially arises from the growth in this salary, the FTM suggests that if Mr. Macy's normal billing fee of $250 per hour is taken into consideration, then not only was his salary reasonable, but he was actually "undercompensated through the years." Pl.'s Mem. at 14. Moreover, the FTM claims that Mr. Macy "contributed about $100,000 of unpaid services through the years to [the] FTM." Id. The FTM asks the Court to infer that such a contribution outweighs any compensation Mr. Macy has received, and that no earnings ultimately inured to his benefit. Pl.'s Mem. at 15. The Court is not so easily swayed. Such an inference is undermined by the fact that the amount of purportedly donated funds received by the FTM from Mr. Macy over the years is measured in terms of sacrifice by Mr. Macy, suggesting that the monetary value gained by the FTM equals the value of his lost billable hours. This

assertion asks the Court to speculate, and, more important, is unsupported by the Administrative

Record.

The flaw in the FTM's attempt to label Mr. Macy's compensation as reasonable by

measuring it against his sacrificed time is that it ignores the Internal Revenue Code's

requirement that a comparison be made between the level of his compensation and "the amount

that would ordinarily be paid for like services by like enterprises . . . under like circumstances."

26 C.F.R. § 53.4958-4(b)(1)(ii)(A).  According to the Special Needs Trust: Administration

Manual, a special needs trust does not have to be administered by an attorney.  AR at 00416.

Rather, "laypersons, such as friends and family of a person with disabilities, and . . .

professionals, including attorneys, financial planners, and social workers" are capable of

administering a special needs trust.  Id.  The record is devoid of reliable evidence showing that

all the services provided by Mr. Macy amounted to legal services and that he received

compensation in an "amount that would ordinarily be paid for like services."  26 C.F.R. §

53.4958-4(b)(1)(ii)(A).  The Administrative Record does show that

> [t]he determination of reasonable compensation is made through informal
> contacts with other organizations that manage similar pooled trust programs and
> through a review of hours spent on Family Trust related activities through the
> year, and typical hourly rates are applied.  [And] each person's time is valued
> commensurately with his or her professional hourly rate, and adjusted downward
> to account for the non-profit nature of Family Trust and its current early stage of
> development.

AR at 00018 (emphasis added).  But, unfortunately for the FTM, the Court cannot rely on its

"informal contacts" to determine whether Mr. Macy's compensation was reasonable; it must rely

on what is actually contained in the Administrative Record.  Moreover, the plaintiff offers no

authority to support its belief that a charitable organization must necessarily pay a salary

commensurate with the employee's primary occupation or skill level.

"Although control of financial decisions by individuals who appear to benefit personally

from certain expenditures does not necessarily indicate inurement of benefit to private

individuals, those factors coupled with little or no facts in the administrative record to indicate

the reasonableness and appropriateness of the expenses are sufficient to convince [a court] that

there is indeed prohibitive private inurement." Orange County, 893 F.2d at 534 (quoting Unitary

Mission Church v. Comm'r, 74 T.C. 507, 515 (1980)).  Because the Administrative Record

clearly demonstrates Mr. Macy's overwhelming control of the FTM, and, at the same time,

reveals an absence of "comparability data" showing the reasonableness of his compensation, the

Court "can[not] be assured that it is not sanctioning an abuse of the revenue laws." Bubbling

Well, 74 T.C. at 535; New Dynamics, 70 Fed. Cl. at 802 ("It is well accepted that, in initial

qualification cases such as this, gaps in the administrative record are resolved against the

applicant . . . , at least where the party with the burden of proof also controls the relevant

evidence.").[4]

    B.  Is the FTM organized and operated exclusively for an exempt purpose?

"In order to be exempt as an organization described in [§] 501(c)(3), [the FTM] must

[show that it is] both organized and operated exclusively for one or more [exempt]

purposes . . . ." 26 CFR § 1.501(c)(3)-1(a)(1).  Because the government concedes that the FTM

was organized for an exempt purpose, the Court need only address the question of whether it is

operated exclusively for an exempt purpose.  Gov't's Mem. at 15; Pl.'s Mem. at 4.  The FTM

"will be regarded as operated exclusively for one or more exempt purposes only if it engages

---

[4]    Citing multiple cases, the court in New Dynamics stated that "[w]hile such an adverse inference generally
is more a product of common sense than of the common law, here, it derives added support from [§ 7428] itself,
which emphasizes the need for a taxpayer to exhaust its administrative remedies as a precursor to suit.  For this court
to not weigh gaps [in the record] against plaintiff would be to encourage [taxpayers] to play a tight-lipped form of
cat and mouse with [IRS] information requests that makes no sense generally and particularly not in the confines of
the explicit and implicit directions of the Code." 70 Fed. Cl. at 802 (internal quotations and citations omitted).

primarily in activities which accomplish one or more of such exempt purposes specified in §

501(c)(3)." 26 C.F.R. § 1.501(c)(3)-1. "[It] will not be so regarded if more than an insubstantial

part of its activities is not in furtherance of an exempt purpose." Id. "It is well-settled that an

'incidental non-exempt purpose will not disqualify an organization, but a single substantial non-

exempt purpose or activity will destroy the exemption, regardless of the number or quality of

exempt purposes." New Dynamics, 70 Fed. Cl. at 799 (citing, among others, Better Business

Bureau of Washington, D.C., Inc. v. United States, 326 U.S. 279, 283 (1945) ("This plainly

means that the presence of a single [non-exempt] purpose, if substantial in nature, will destroy

the exemption regardless of the number or importance of truly [non-exempt] purposes.")).

Whether the FTM satisfies the operational test "is a question of fact to be resolved on the

basis of the administrative record," New Dynamics, 70 Fed. Cl. at 800; accord Fund for the

Study of Economic Growth and Tax Reform v. I.R.S., 161 F.3d 755, 758-759 (D.C. Cir. 1998),

and "[u]nder the . . . test, the purpose toward[] which an organization's activities are directed,

and not the nature of the activities themselves, is ultimately dispositive of the organization's

right to be classified as a [§] 501(c)(3) organization exempt from tax under [§] 501(a)," B.S.W.

Group, 70 T.C. at 356-357. "[T]he critical inquiry is whether [the FTM]'s primary purpose for

engaging in its sole activity is an exempt purpose, or whether its primary purpose is the

nonexempt one of operating a commercial business producing net profits for [the FTM]." Id. at

357. "When the legality of an action depends not upon its surface manifestation but upon the

undisclosed motivation of the actor, similar acts can lead to diametrically opposite legal

consequences." Presbyterian and Reformed Pub. Co., 743 F.2d at 155. Therefore, "[i]n cases

where an organization's activities could be carried out for either exempt or nonexempt purposes,

courts must examine the manner in which those activities are carried out in order to determine

their true purpose." Arlie, 283 F. Supp. 2d at 63 (emphasis in original); see Nonprofits' Ins.

Alliance of California v. United States, 32 Fed. Cl. 277, 283 (1994) (citing Living Faith, Inc. v.

Comm'r, 950 F.2d 365, 372 (7th Cir. 1991)).

"In applying the operational test, courts have relied on what has come to be termed the

'commerciality' doctrine." Arlie, 283 F. Supp. 2d at 63. The major factors courts have

considered in assessing commerciality are: "the particular manner in which an organization's

activities are conducted, the commercial hue of those activities, and the existence and amount of

annual or accumulated profits." B.S.W. Group, 70 T.C. at 358. Courts have further considered,

among other factors, "competition with for-profit commercial entities; [the] extent and degree of

below cost services provided; pricing policies; and [the] reasonableness of financial reserves," as

well as "whether the organization uses commercial promotional methods (e.g., advertising) and

the extent to which the organization receives charitable donations." Arlie, 283 F. Supp. 2d at 63;

accord Nonprofits' Ins. Alliance, 32 Fed. Cl. at 283. Some of these factors lead the Court to

conclude that the FTM is shrouded with a "commercial hue."

1.   The FTM's non-solicitation of charitable contributions

Although the FTM contends that the "source of an organization's funding is not

determinative of whether it is entitled to tax-exempt status," asserting instead that "it is the use of

the funds that is germane," Pl.'s Mem. at 12, it seemingly misunderstands the IRS's argument.

The IRS is not taking issue with the propriety of a separate business, trust, or fund being

managed collectively to finance charitable activities; rather, the IRS is pointing to the source of

the FTM's funding for the purpose of demonstrating that it has relied solely on a fee structure

imposed on its members that is sufficient to recoup projected costs, instead of mitigating the

costs to beneficiaries by soliciting charitable contributions or implementing other creative

measures to amass funds. Gov't's Mem. at 20-21; see AR at 00334 (FTM's admission that

"[c]haritable donations are not appropriate for trust administration"). Furthermore, even if the

Internal Revenue Code does not require the solicitation of charitable contributions as a condition

of tax-exempt status, courts have, nonetheless, consistently found an absence of such

solicitations as indicative, though not always dispositive, of a non-exempt purpose. B.S.W.

Group, 70 T.C. at 358; Arlie, 283 F. Supp. 2d at 63. And, while the FTM goes on to suggest that

some tax-exempt organizations are not even eligible to receive deductible contributions, making

public solicitation of contributions difficult, the FTM makes no attempt to show that such a

constraint hinders its ability to accept contributions. Pl.'s Reply at 9. The Court can only

wonder why a purported charitable organization seeking qualification for tax-exempt status

would not capitalize on the possible benefit of contributions that might offset operating costs for

its beneficiaries.

      2. The FTM's profit margin is significant

      The FTM urges the Court to find that "[w]hat matters . . . is not the volume of business or

the amount of 'profits,'" but rather "[t]he organization's charitable purpose and the absence of

personal profit." Id. at 9. The Court certainly recognizes that the amount of profits will not

always be dispositive of the presence of a non-exempt purpose, but it is not convinced that profit

margins are of no consequence in this case. It is, in fact, one of several factors from which the

true purpose of an organization may be inferred, and when considering the "totality of the

circumstances," certain factors, such as profits, may have added significance. Arlie, 283 F.

Supp. 2d at 65. As previously noted, it is difficult to escape the obvious correlation between

increasing profits and the founder's increasing salary derived from these funds. And when this

fact is viewed in light of other factors, such as the absence of solicitation of charitable

contributions, the FTM's profit margin begins to appear more a product of a growing

commercial enterprise than a tool for expanding the pooled investments that might enable

beneficiaries to reap a greater return or enjoy reduced fees.

       3.  <u>The FTM's services viewed as a commercial product</u>

       The IRS contends that the FTM "act[s] as an adjunct to [Mr.] Macy's private elder law

practice, reaching only the 'select group' of the relatively affluent disabled to whom trustee

services might be provided profitably."  Gov't's Mem. at 26.  Because the FTM's response relies

only on the premise that no beneficiaries were referred to Mr. Macy's practice by or from the

trust, the Court remains skeptical as to the possibility that the FTM's services are being offered

as a commercial product by Mr. Macy's firm and other local practitioners.

> With respect to providing legal services to beneficiaries, the FTM states that
>
> Mr. Macy does provide such services on occasion, exclusively in cases where his attorney-client relationship was established prior to the formation of the trust account for the individual.  Such cases arise because Mr. Macy refers his own disabled clients to the pooled trust if they meet the criteria of [the] FTM's charitable class.  Mr. Macy has never become the attorney for any beneficiary as a result of, or subsequent to, that person becoming a beneficiary of the pooled trust.

AR at 00222.  While on first blush this argument may seem convincing, it is undercut by the

absence of any evidence regarding whether Mr. Macy's legal practice is acquiring clients in the

first place due in part because of his connection to the FTM and the services it provides.

"Information regarding [the] FTM's program is disseminated primarily through word-of-mouth

in the elder law communities" by healthcare and legal professionals.  AR at 00079 ¶ 3.  The

"manner" in which Mr. Macy and other members of the legal community go about connecting

eligible individuals with the FTM's services suggests that those services are a commercial

product in disguise being touted by Mr. Macy and others who make referrals to the trust.  <u>Id.</u>

The facts that Mr. Macy founded the program as a result of his law firm's specialization in

advice regarding trusts, estate planning, guardianship, and probate matters for elderly clients, AR at 00016, and his legal office remains listed as the FTM's principal place of business, AR at 00001, only reinforce the idea that its services provide a marketable product to offer potential clients. And though procurement of new clientele for Mr. Macy's law practice may not be the sole purpose of the FTM, the Court views this inevitable benefit as amounting to more than just an incidental non-exempt purpose. That the FTM can easily be viewed as a selling point for legal professionals imbues it, at least somewhat, with a "commercial hue."

## IV.  CONCLUSION

For the foregoing reasons, the Court finds that summary judgment must be granted in favor of the United States because of the FTM's inability to demonstrate that it is operated solely for exempt purposes, and that its net earnings do not provide a private benefit to any individual.

**SO ORDERED** this 24th day of September, 2012.[5]

REGGIE B. WALTON
United States District Judge

---

[5]     The Court will contemporaneously issue an Order consistent with this Memorandum Opinion.